UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

HERBERT E. LIVERMAN, *et al.*,

Plaintiffs,

v.

CITY OF PETERSBURG, *et al.*

Defendants.

Civil Action No. 3:14–CV–139

## **MEMORANDUM OPINION**

THIS MATTER is before the Court on the Plaintiffs' Motion for Summary Judgment as to Liability, Declaratory Judgment, and an Injunction as to Counts I and II of Plaintiffs' Complaint ("Plaintiffs' Motion") (ECF No. 17), and a Motion for Summary Judgment ("Defendants' Motion") (ECF No. 20), filed by Defendants, City of Petersburg ("the City") and John I. Dixon ("Chief Dixon") (collectively, the "Defendants"). Specifically, Plaintiffs Herbert E. Liverman ("Liverman") and Vance R. Richards ("Richards") (collectively, the "Plaintiffs") move for partial summary judgment on Counts I and II of Plaintiffs' Complaint, seeking declaratory and injunctive relief in addition to compensatory and punitive damages[1] for claims that Defendants violated their rights under the Free Speech Clause of the First Amendment to the United States Constitution.  Plaintiffs claim Defendants punished them pursuant to written policies for speaking out on social media as citizens regarding matters of public concern.[2] Defendants, on the other hand, move this Court for summary judgment as to all counts of

---

[1] Although Plaintiffs seek compensatory and punitive damages, as well as injunctive relief, costs, and attorneys' fees via their Complaint, *see* Complaint ("Compl.") ¶¶ 112, 117, in their moving papers they claim that they "did not move for summary judgment as to damages" and are only seeking equitable relief.  Pls.' Reply at 9.

[2] This Circuit has not yet addressed constitutional issues emerging in the context of social media policies.

Plaintiffs' Complaint.  The parties have not requested a hearing on this matter, and the Court finds that oral argument is unnecessary. E.D. Va. Loc. Civ. R. 7(J).

For the reasons stated below, the Court will GRANT IN PART and DENY IN PART Plaintiffs' Motion, and GRANT IN PART and DENY IN PART Defendants' Motion.

## I.     FACTUAL BACKGROUND

This case arose after Plaintiffs, each police officers, were put on probation for posting comments on the social media website Facebook and noticing, via written letter, claims against Defendants.  Plaintiffs bring this action pursuant to 42 U.S.C § 1983 against Defendants, alleging that they violated Plaintiffs' First Amendment rights by subjecting them to unconstitutional social networking policies issued by the City of Petersburg Police Department ("the Department").  In particular, Plaintiffs claim that the Department improperly impinged upon their rights under the Free Speech Clause of the First Amendment by preventing them, through the Department's written policies, from speaking out as citizens regarding matters of public concern and by retaliating against them for seeking to exercise these rights.  Defendants deny liability in all respects.  Additionally, Chief Dixon asserts the defense of qualified immunity to Plaintiffs' claims for monetary damages.

Except as indicated, the following facts are not in dispute.  Liverman was an officer with the Department for approximately eighteen years before he resigned on January 10, 2014.  He attended Virginia State University, and served as an instructor at the regional police academy. His disciplinary record shows "behavioral and judgmental problems" beginning as early as December of 1995.  Br. in Supp. of Defs.' Mot. at 3 (citing Exs. 1, 4).  Richards is also a veteran police officer with twenty-one years of law enforcement experience, including four years with the Department.  He is currently a Crisis Intervention officer as well as a patrol officer with the Department.  He trained with the New York Police Department Special Victims Unit.  Neither Liverman nor Richards have served in a policy-making position.  Chief Dixon is the Chief of Police for the Department.  He has served in this role for approximately seven years.

In December of 2010, Major Charlene Hinton ("Major Hinton")[3] drafted the Department's first social networking policy, entitled "General Order 100-1." General Order 100-1 became effective on December 1, 2010 after being approved by Chief Dixon. *See id.* Ex. 2, ¶ 4, B ("the 2010 Social Networking Policy").

In or around April of 2013, the 2010 Social Networking Policy was reviewed and reformatted. This edited policy, entitled, "General Order 400-23," was approved by Chief Dixon and issued on April 15, 2013. "The overall substance of the policy did not change." *Id.* at ¶ 13 (citing Ex. 2, ¶ 5, C) ("the 2013 Social Networking Policy"). Thus, as of April 15, 2013, Liverman and Richards were accountable for following the 2013 Social Networking Policy.

On June 17, 2013, while he was off-duty, Liverman "posted" on Facebook the following communication ("Liverman's Initial Post") as an expression of his opinion formed as a citizen:

> Sitting here reading posts referencing rookie cops becoming instructors. Give me a freaking break, over 15 years of data collected by the FBI in reference to assaults on officers and officer deaths shows that on average it takes at least 5 years for an officer to acquire the necessary skill set to know the job and perhaps even longer to acquire the knowledge to teach other officers. But in todays world of instant gratification and political correctness we have rookies in specialty units, working as field training officer's [sic] and even as instructors. Becoming a master of your trade is essential, not only does your life depend on it but more importantly the lives of others. Leadership is first learning, knowing and then doing.

Liverman's Initial Post was supported by an authoritative source.[4] This post was "liked" by at least thirty-two people and received many comments. In response to Liverman's Initial Post, Richards wrote the following on Facebook:

> Well said bro, I agree 110% . . . Not to mention you are seeing more and more younger Officers being promoted in a Supervisor/ or [sic] roll [sic]. It's disgusting and makes me sick to my stomach DAILY. LEO Supervisors should be promoted by experience . . . And what comes with experience are "experiences"

---

[3] Major Hinton serves as one of two majors working for the Department. She also serves as the Department's Chief of Staff.

[4] Federal Bureau of Investigations, U.S. Dept. of Justice, *Violent Encounters: A Study of Felonious Assaults on Our Nation's Law Enforcement Officers* 159 (Aug. 2006) ("The amount of street time needed in any agency to lose the rookie status varies from agency to agency. Many officers expressed that this generally occurs after spending 5 years on patrol and becoming comfortable with their position in the law enforcement profession.").

> that "they" can pass around to the Rookies and younger less experienced Officers. Perfect example and you know who I'm talking about . . . . How can ANYONE look up, or give respect to a SGT in Patrol with ONLY 1 ½ years experience in the street? Or less as a matter of fact. It's a Law Suit waiting to happen. And you know who will be responsible for that Law Suit? A Police Vet, who [sic] knew tried telling and warn [sic] the admin for promoting the young Rookie who was too inexperienced for that roll [sic] to begin with. I'm with ya bro[5] . . . smh[.][6]

("First Comment"). Later that day, Liverman stated:

> There used to be a time when you had to earn a promotion or a spot in a specialty unit . . . but now it seems as though anything goes and beyond officer safety and questions of liability, these positions have been "devalued" . . . and when something has no value, well it is worthless.

("Comment"). Subsequently, Richards replied:

> Your right . . . The next 4 yrs can't get here fast enough . . . From what I've been seeing I don't think I can last though. You know the old "but true" saying is . . . Your Agency is only as good as it's Leader(s) . . . It's hard to "lead by example" when there isn't one . . . smh[.][7]

(Second Comment").

Excluding Richards and Liverman, thirty-four people either "liked" or commented on the Facebook postings at issue. *Id.* at Ex. 7 at 30-40; Ex. 5, ¶ 4. Of the thirty-four people who either liked or commented on those Facebook posts, twenty-eight of those people knew Liverman was an officer with the Department, six people were Department employees, and seventeen people were former Department employees. Br. in Supp. of Defs.' Mot. at ¶ 21. Both Liverman and Richards made these Facebook exchanges from their personal computers while they were off-duty and at their respective homes. After a Department employee brought Liverman's and Richards' Facebook communications to the attention of the Department, *see id.* at Ex. 5, ¶ 3,

---

[5] Of this First Comment, Richards was only disciplined, specifically, for the part reading, "Perfect example, and you know who I'm talking about . . . How can ANYONE look up, or give respect to a SGT in Patrol with ONLY 1 ½ years experience in the street? Or less as a matter of fact. It's a Law Suit waiting to happen. And you know who will be responsible for that Law Suit? A Police Vet, who knew tried telling and warn [sic] the admin for promoting the young Rookie who was too inexperienced for that roll [sic] to begin with. I'm with ya bro . . .'"

[6] "SMH" means "Shaking My Head." *See* Defs.' Mem. Ex. 8 at 35.

[7] Of this Second Comment, Richards was only disciplined for the part reading "It's hard to 'lead by example' when there isn't one."

they[8] were each investigated for posting the aforementioned comments to Facebook in violation of the 2013 Social Networking Policy, *id.* at ¶ 14.  As a consequence, they were subsequently disciplined for this exchange and were notified of their discipline on or about July 8, 2013.

In particular, the "Narrative of Events/Action" on the Disciplinary Action Report form for Liverman, signed on July 8, 2013, states,

> During a 'Facebook' exchange with Officers Vance Richards and Evan Jones, Liverman made the [C]omment, 'There used to be a time when you had to earn a promotion or a spot in a specialty unit . . . but now it seems as though anything goes and beyond officer safety and questions of liability, these positions have been 'devalued' . . . and when something has no value, well it is worthless.'

Likewise, Richards' "Narrative of Events/Action," signed July 8, 2013, states

> During a 'Facebook' exchange with Officers' [sic] Herbert Liverman and Evan Jones, Richards made the comment, 'Perfect example, and you know who I'm talking about . . . How can ANYONE look up, or give respect to a SGT in Patrol with ONLY 1 ½ years experience in the street? Or less as a matter of fact. It's a Law Suit waiting to happen. And you know who will be responsible for that Law Suit? A Police Vet, who [sic] knew tried telling and warn [sic] the admin for promoting the young Rookie who was too inexperienced for that roll [sic] to begin with. I'm with ya bro . . .'  In addition, 'It's hard to lead by example' when there isn't one. . .

In response to these comments, Chief Dixon directed that Liverman and Richards be returned to probation for one reason: violating bureau policy.[9]  Specifically, the Department claimed that Plaintiffs violated Section 4, Part IV, entitled "Procedures," of the 2013 Social Networking Policy, which provides:

> Negative comments on the internal operations of the Bureau, or specific conduct of supervisors or peers that impacts the public[']s perception of the department is not protected by the First Amendment free speech clause, in accordance with established case law.[10]

---

[8] Defendants claim, generally, that both Liverman and Richards were aware of the 2013 Social Networking Policy in effect in June of 2013.  Br. in Supp. of Defs.' Mot. at ¶ 15.

[9] At one point in their moving papers, Defendants argue that Liverman and Richards were not disciplined solely for the reason listed in their Disciplinary Action Report form.  Rather, Defendants argue that Chief Dixon disciplined them for a number of reasons not specifically set forth in the Disciplinary Action Report forms.

[10] The source of Defendants' authority, if any, for returning Liverman and Richards to probation for alleged violations is a disputed fact.

In sum, "As a result of the investigation into the Facebook postings, Liverman was disciplined for his *second* post [*i.e.*, the Comment] in violation of [] the 2013 Social Networking Policy." *Id.* at ¶ 22 (emphasis added). "The Department found that Liverman made negative comments on the internal operations of the Department, or specific conduct of supervisors or peers that impacted the public's perception of the Department through his Facebook postings." *Id.* Likewise, "[a]s a result of the investigation into the Facebook postings, Richards was disciplined for . . . [his First Comment and Second Comment] in violation of the 2013 Social Networking Policy." *Id.* at ¶ 23. The Department found, in particular, that these postings amounted to negative comments that painted the Department in an unfavorable light. Because of their June 17, 2013 Facebook commentary, Plaintiffs were both given oral reprimands and "returned" to probation[11] for six months beginning on June 17, 2013.

While Major Hinton prepared the Personnel Action forms for approval and signature by City officials indicating a return to probation for Liverman and Richards, the City was not involved in the investigation or determination of discipline. Furthermore, while the Disciplinary Actions forms indicated the reason for Plaintiffs' return to probation and the source of the violation as the 2013 Social Networking Policy, the Personnel Action forms did not. Ultimately, Chief Dixon signed both Disciplinary Action Report forms for Plaintiffs as well as their Personnel Action forms. The City Manager only signed the Personnel Action forms for Plaintiffs.

Because of the return to probation, Richards and Liverman were each notified by letter dated August 13, 2013 of the Department's decision that Plaintiffs were ineligible to participate in the testing for the position of sergeant in the most recent promotion pool. Pl.'s Br. in Supp. of Pls.' Mot. at ¶ 18; Br. in Supp. of Defs.' Mot. at ¶ 38. The events leading up to Plaintiffs receiving

---

[11] Every Department employee undergoes a probationary period of at least six months at the beginning of their employment. Liverman and Richards had completed that probationary period long before they were "returned" to probation because of their Facebook comments at issue.

this letter of denial are as follows.  On July 25, 2013, an announcement was made concerning the opening of an application and testing process for eligible candidates to be promoted to the rank of sergeant.  On July 26, 2013, a policy was published, General Order 100-14, § III(f) ("Promotion Opportunity Policy"), excluding Richards and Liverman from participation in the promotion process on the basis of their probationary status.  Thus, the Promotion Opportunity Policy was promulgated just one day after the promotional opportunity was announced and approximately ten days after Liverman and Richards were notified of their discipline.

The Promotion Opportunity Policy replaced the prior promotion procedures policy, "General Order 1-12A," under which Liverman and Richards would have been permitted to participate in the promotion process despite the discipline.  In other words, the Promotion Opportunity Policy modified the prior General Order 1-12A on the issue of promotional procedures.  Unlike the prior order, the Promotional Opportunity Policy prohibits probationary employees from testing for the rank of sergeant.  In fact, the prior order made no mention of employees who are on probation, while the Promotional Opportunity Policy explicitly says such employees are "ineligible" to participate in the promotional examination.  Apart from having been returned to probation, Plaintiffs each met the eligibility requirements for testing for the promotion.  In sum, Liverman and Richards each applied for the promotion to the rank of sergeant but because of their probationary status resulting from the Facebook postings, they could not participate in the promotional process.  Br. in Supp. of Pls.' Mot. at ¶ 18; Br. in Supp. of Defs.' Mot. at ¶ 38.

On October 1, 2013, Liverman and Richards made it known via letter that they planned to file suit against Chief Dixon and the City for being orally reprimanded and returned to probation for the speech at issue on Facebook.  Subsequently after Plaintiffs' sent such letter, Plaintiffs were the subject of several complaints and investigations by the Defendants.

## II.    PROCEDURAL BACKGROUND

On March 5, 2014, Plaintiffs filed a Complaint in this Court, seeking relief against Chief Dixon, both individually and in his official capacity as the Chief of Police of the Department, as well as the City, pursuant to 42 U.S.C. § 1983. Specifically, Plaintiffs' causes of action can be grouped into three categories.  First, Plaintiffs allege First Amendment violations pursuant to the 2010 Social Networking Policy[12] and 2013 Social Networking Policy.  Second, Plaintiffs claim that the Department took adverse employment actions against them in retaliation for their comments at issue on Facebook.  Third, Plaintiffs allege that investigations were opened against them in retaliation for their notice of claims in contravention of the First Amendment.  Plaintiffs seek a declaratory judgment stating that their First Amendment rights were violated by Defendants' social networking policies; an injunction barring infringement of Plaintiffs' or other employees' First Amendment rights as the 2013 Social Networking Policy is the present operative policy in effect at the Department; compensatory damages in the amount of $2 million or such amount as the jury awards; attorneys' fees; and exemplary and punitive damages against Chief Dixon in the amount of $350,000.00 or such amount as the jury awards.

On October 22, 2014, Plaintiffs filed a Motion for Partial Summary Judgment, only requesting that the Court find that the 2010 Social Networking Policy and the 2013 Social Networking Policy are unconstitutional.  Defendants filed their Opposition on October 31, 2014 ("Defs.' Opp'n Mem.") (ECF No. 22).  Subsequently, on November 3, 2014, Plaintiffs filed a Reply ("Pls.' Reply") (ECF No. 23).

On October 27, 2014, Defendants filed a Motion for Summary Judgment as to all counts contained in Plaintiffs' Complaint.  Plaintiffs filed their response in opposition on November 6, 2014 ("Pls.' Opp'n Mem.") (ECF No. 24).  On November 10, 2014, Defendants filed their reply brief ("Defs.' Reply") (ECF No. 26).

This matter is now ripe for review.

---

[12] The 2010 Social Networking Policy is not relevant or actionable under the facts.

### III.    LEGAL STANDARD

When faced with cross-motions for summary judgment, the Court applies the same standard as that applied to individual motions for summary judgment.  *See Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003).  The Court must consider "each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law."  *Id.* at 523 (internal citations and quotations omitted).  A motion for summary judgment should be granted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  If there is no genuine dispute as to any material fact, it is the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial."  *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993) (internal citations and quotations omitted).

A court must look to the specific facts pled to determine whether a triable issue exists.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-49 (1996).  The moving party bears the burden of establishing the nonexistence of a triable issue of fact by showing—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case.  *Celotex Corp.*, 477 U.S. at 325 (internal quotations omitted).  "The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the [nonmoving party] is entitled to a verdict."  *Anderson*, 477 U.S. at 252.

All "factual disputes and any competing, rational inferences [are resolved] in the light most favorable to the party opposing that motion."  *Rossignol*, 316 F.3d at 523 (internal citations and quotations omitted).  But only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  *Anderson*, 477 U.S. at 248.  "Mere unsupported speculation is not sufficient to defeat a summary judgment motion if the undisputed evidence indicates the other party should win as a matter of law."  *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 308 (4th Cir. 2006).  If, therefore,

the nonmoving party's evidence is only colorable or is not significantly probative, the court may grant summary judgment. *Anderson*, 477 at 249–50.

## IV.   DISCUSSION

### A.   *The 2013 Social Networking Policy*

The Court begins with Richards' and Liverman's First Amendment claim regarding the validity (or invalidity) of the 2013 Social Networking Policy. [13]  As a preliminary matter, previous decisions dictate that constitutional speech protections extend to certain Facebook posts and communications over the internet.  *See e.g.*, *Reno v. American Civil Liberties Union*, 521 U.S. 844, 870 (1997) (holding that a statute, which prohibited transmitting obscene or indecent communications over the internet, restricted First Amendment speech); *Bland v. Roberts*, 857 F. Supp. 2d 599 (E.D. Va. 2012), *rev'd*, 730 F.3d 368 (4th Cir. 2013) (concluding that a Sheriff's employee's "like" of a political campaign Facebook page constitutes First Amendment protected speech); *Mattingly v. Milligan*, No. 4:11CV00215, 2011 WL 5184283, at *2-*3 (E.D. Ark. Nov. 1, 2011) (finding that an employee's reference on his Facebook wall to the firing of various employees was an expression of constitutionally protected speech).

"It is clearly established that a State may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech." *Rankin v. McPherson*, 483 U.S. 378, 383 (1987).  The Supreme Court has stated that "a citizen who works for the government is nonetheless a citizen.  The First Amendment limits the ability of a public employer to leverage the employment relationship to restrict, incidentally or intentionally, the liberties employees enjoy in their capacities as private citizens." *Garcetti v. Ceballos*, 547 U.S. 410, 419 (2006).  Indeed, "public employees do not surrender all their First Amendment rights by reason of their employment.  Rather, the First Amendment protects a public employee's

---

[13] Because Plaintiffs were disciplined pursuant only to the 2013 Social Networking Policy, which overrode any prior social networking policies, the Court finds that it only needs to examine the language of said policy, which is still presently in effect at the Department.  There is no need to make detailed findings with respect to the prior version of the policy.

right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Id.* at 417.

It is well-settled that to sustain a *prima facie* case in support of a First Amendment freedom of speech claim, the plaintiff must establish the following elements:  (1) the employee spoke as (i) a citizen on a (ii) matter of public concern; (2) the employee's and public's interests in the First Amendment expression outweighs the employer's legitimate interest in the efficient operation of the workplace, if that interest was infringed by the communication, and (3) the protected speech is a substantial factor in the decision to take adverse employment action. *Smith v. Gilchrist*, 749 F.3d 302, 308 (4th Cir. 2014); *Love-Lane v. Martin*, 355 F.3d 766, 776 (4th Cir. 2004).

The second factor in this analysis is known as the *Pickering* balancing test.  *Pickering v. Bd. of Edu.*, 391 U.S. 563 (1968).[14]  In *Pickering*, the Supreme Court struck a balance between the right of the employee to speak and the employer's interest in effectively conducting its affairs.  The *Pickering* balancing test involves a two-step inquiry:  initially, a court must determine whether the speech that led to an employee's discipline regarded a matter of public concern; and second, if it does, free speech concerns are balanced against efficient public service concerns.  When an employee challenges an official policy that applies to all employees of the governmental entity, "[t]he Government must show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by the expression's 'necessary impact on the actual operation'

---

[14] To the extent Plaintiffs assert any facial, as applied, or overbreath challenges to the 2013 Social Networking Policy, or rely upon the Supreme Court's prior restraint doctrine, this Court follows the approach taken in other courts, which have indicated that these claims merge into the *Pickering/NTEU* analysis.  *See Harman v. City of N.Y.*, 140 F.3d 111, 118 (2d Cir. 1998) ("[U]nder the *Pickering/NTEU* test[,] the distinction between facial as-applied constitutional challenges becomes unimportant"); *Weaver v. United States Info. Agency*, 87 F.3d 1429, 1440 (D.C. Cir. 1996) (holding that the special concerns implicated by prior restraints can be addressed in the *Pickering* analysis).

of the Government."  *United States v. Nat'l Treasury Employees Union*, 513 U.S. 454, 468 (1995) ("NTEU").

Here, Defendants do not dispute that Liverman and Richards were speaking as private citizens under the first element of the above-defined test.[15]  Moreover, as to last prong of the *prima facie* case, it is unarguable because Defendants concede that the Department disciplined Liverman and Richards by orally reprimanding the Plaintiffs and returning them to probation for six months.

Thus, against the backdrop of the aforementioned facts, as seen through the prism of the *Pickering* analysis, the following issues take shape.  First, the Court must determine whether Liverman's and Richards' speech[16] is worthy of First Amendment protection because it relates to a matter of public concern.  *See McVey v. Stacy*, 157 F.3d 271, 277 (4th Cir. 1998).  Second, the Court must balance the value of Plaintiffs' speech against Defendants' justification for harnessing it—in other words, the Court must determine whether the interests of Defendants in the efficient operation of the police department outweigh the interests of the public and Plaintiffs in the speech.  *Id.* at 277-78; s*ee Urofsky v. Gilmore*, 216 F.3d 401, 406 (4th Cir. 2000) (en banc) (instructing that, if the speech involves a matter of public concern, then the court must determine whether the employee's First Amendment interest "outweighs the public employer's interest in what the employer has determined to be the appropriate operation of the workplace.").

---

[15] A person is *not* speaking as a citizen when making statements pursuant to official duties. *Garcetti*, 547 U.S. at 421.  This Court notes that Defendants concede that Plaintiffs were not making statements pursuant to their official duties.  *See id.*
[16] Liverman and Richards must each be judged separately for their own statements, but those statements will be understood in context, form, and content.  *Se*e *Campbell v. Galloway*, 483 F.3d 258, 267 (4th Cir. 2007) (citing *Connick v. Myers*, 461 U.S. 138, 147-48(1983) (instructing that content, form, and context of a given statement, as revealed by the whole record., must be considered when determining whether an employee's speech addresses a matter of public concern).

i.  Public Concern

The first part of the *McVey/Pickering* test concerns whether Liverman and Richards, considered separately, were speaking on matters of public concern.  "Speech involves a matter of public concern when it involves an issue of social, political, or other interest to a community." *Kirby v. City of Elizabeth City, N.C.*, 388 F.3d 440, 446 (4th Cir. 2004).  On the other hand, "[w]hen employee expression cannot fairly be considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment." *Connick,* 461 U.S. at 146.  As such,

> When a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.

*Id.* at 147.  There can be no doubt that "[p]ersonal grievances, complaints about conditions of employment, or expressions about other matters of personal interest do not constitute speech about matters of public concern that are protected by the First Amendment, but are matters more immediately concerned with the self-interest of the speaker as employee." *Stroman v. Colleton Cnty. Sch. Dist.*, 981 F.2d 152, 156 (4th Cir. 1992).  "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick,* 461 U.S. at 147–48.  "This is a highly fact-intensive inquiry, which may be influenced by any variety of factors," *Stickley v. Sutherly*, 416 F. App'x 268, 272 (4th Cir. 2011), including whether an individual was merely seeking redress for her own personal employment grievances. *Compare Brooks v. Arthur*, 685 F.3d 367, 372, 374 (4th Cir. 2012) (holding that the plaintiff's EEO complaint, which referred to race and religion, was not on a matter of public concern, where the complaint was "replete with I's and me's" and did not "seek anything other than an improvement of his own situation"); *with Campbell v. Galloway*, 483 F.3d 258, 269–70 (4th Cir. 2007) (holding that a female police

officer's letter complaining of sexual harassment and gender discrimination touched on matters of public concern where the letter "included complaints about inappropriate conduct directed towards other female [officers]" and "members of the public" and did not merely seek "to resolve [the officer's] own personal problem").

Additionally, as directed by the Fourth Circuit, while this Court must view the statements cited as the basis of the punishment "as a single expression of speech to be considered in its entirety," *Campbell*, 483 F.3d at 267 (quoting *Stroman*, 981 F.2d at 157), that does "not give [the Court] license to ignore portions" of the communication that touch on a matter of public concern, *id*. at 268. In other words, even if only part of the communication touched on a matter of public concern, the first element of the above-defined standard is still satisfied. *See Connick,* 461 U.S. at 149 ("Because *one of the questions* in Myers' survey touched upon a matter of public concern, and contributed to her discharge[,] we must determine whether Connick was justified in discharging Myers.") (emphasis added); *see also Stroman,* 981 F.2d at 158 (treating as a matter of public concern a letter that was in large part a discussion of personal grievances but also mentioned a matter that could have been of public concern).

The Court will now address each of Liverman's and Richards' statements that are at issue and explain whether the comments regard public or private concerns.

### 1. Whether Liverman Spoke on a Matter of Public Concern When He Made His Comments on Facebook

The evidence shows that Liverman was disciplined for his Comment—not for his Initial Post. His Comment provides,

> There used to be a time when you had to earn a promotion or a spot in a specialty unit . . . but now it seems as though anything goes and beyond officer safety and questions of liability, these positions have been 'devalued' . . . and when something has no value, well it is worthless.

*See* Br. in Supp. of Pls.' Mot. at Ex. 22 ("Disciplinary Action Report Form for Liverman").

Liverman's Comment does not evidence merely private concerns—that is, it is not criticism of his employer's isolated decisions. Rather, the speech implicated issues of public

safety by noting concerns of "officer safety and questions of liability," and was something of general interest to the public. His speech was a vigorous attempt to bring issues of inexperienced officers in supervisory positions to the forefront. Further, the speech was an example of the shortcomings of the promotional process leading to an untoward result. Viewed through this lens, Liverman's Comment concerned not just the Department for which he specifically worked, but symptoms of a perceived greater illness. The matters Liverman commented upon are clearly related to a matter of public concern, and further are "of the highest public concern, and as such they are entitled to the highest level of First Amendment protection." *Goldstein v. Chestnut Ridge Volunteer Fire Co.*, 218 F.3d 337, 355 (4th Cir. 2000). Liverman was participating in or propelling a debate over public safety as a "member[] of a community most likely to have informed and definite opinions" about a wide range of matters, related, directly or indirectly, to their employment. *Pickering*, 391 U.S. at 572.

To be certain, inquiry into the form and context of the speech confirms that Liverman's Comment warrants protection. Regarding the form of the speech, the record supports a finding that Liverman was, at the very least, joining or contributing to a public debate regarding the propriety of promoting young officers to supervisory positions. Regarding the Comment's context, Liverman's Initial Post[17] does not concern speech propelled by self-interest. In his Initial Post, he referenced others posts he saw on Facebook, expressing a concern as an educated citizen with specialized knowledge on a practice that he believe impacted the safety of officers and others. And, he grounded his opinion on data collected and previously published by the Federal Bureau of Investigation ("FBI"). Based on his Initial Post about the study regarding assaults on officers, inexperienced officers and training new officers, his Comment was continuing to discuss issues of "officer safety and questions of liability." Based on the plain language of the Comment, it is not clear that he was critiquing practices of promoting

---

[17] Specifically, the part of the Initial Post providing, "Becoming a master of your trade is essential, not only does your life depend on it but more importantly the lives of others. Leadership is first learning, knowing and then doing."

inexperienced officers in a specific department.   What *is* clear is that he was expressing his concern that the performance of public employees' duties and the operation of the institution were being impeded.   His Comment was certainly relevant to the public's evaluation of the performance of governmental agencies.   That a portion of Liverman's speech may not touch upon a matter of public concern does not alter this conclusion.[18]   *See Connick,* 461 U.S. at 149. For these reasons, Liverman's speech relates to matters of public concern.

### 2. Whether Richards Spoke on Matters of Public Concern When He Made His First Comment and Second Comment on Facebook

To recall, Richards was disciplined for the following language contained in his First Comment on Facebook:

> Perfect example and you know who I'm talking about...How can ANYONE look up, or give respect to a SGT in Patrol with ONLY 1 ½ years experience in the street? Or less as a matter of fact. It's a Law Suit waiting to happen. And you know who will be responsible for that Law Suit? A Police Vet, who [sic] knew tried telling and warn [sic] the admin for promoting the young Rookie who was too inexperienced for that roll [sic] to begin with. I'm with ya bro . . .

He was also disciplined for language included in his Second Comment, providing: "It's hard to 'lead by example' when there isn't one . . . smh." Plaintiffs urge this Court to find that both of Richards' comments made on Facebook were protected under the First Amendment.   Although making a compelling argument that he was saying that inexperienced supervising officers will not be able to set an example necessary for subordinate officers to follow, Richards' argument misses the mark and is unsuccessful.

Examining the speech at issue, this Court concludes that the First Comment and Second Comment pertained to personal grievances and complaints about conditions of employment rather than broad matters of policy meriting the protection of the First Amendment.   Looking within the contours of the speech for which he was disciplined, this Court cannot find any line of

---

[18] Also, "[t]he inappropriate or controversial character of a statement is irrelevant to the question [of] whether it deals with a matter of public concern."   *Rankin v. McPherson*, 483 U.S. 378, 387 (1987).

the communication touching upon a matter of public concern, and thus Richards' speech is not protected by the First Amendment.

Turning first to the content, Richards' First Comment and Second Comment focus on personal dissatisfactions that are not matters of public concern. His speech is replete with references to himself: "you know who I'm talking about" and "And you know who will be responsible for that Law Suit? A Police Vet, who knew [and] tried [sic] telling and warn[ing] the admin" and "I'm with ya bro . . . smh." The Supreme Court has warned courts to guard against "attempt[s] to constitutionalize the employee grievance." *Connick*, 461 U.S. at 154. Richards "did not seek to inform the public that [the inexperienced supervisory officers were] not discharging [their] governmental responsibilities." *Id.* at 148. Second, he did not "seek to bring to light actual or potential wrongdoing or breach of public trust." *Id.*

Plaintiffs' own citation to *Edwards v. City of Goldsboro* undermines their argument as to Richards' speech. 178 F.3d 231 (1999). The speech at issue in *Edwards* stands in sharp contrast to Richards' speech. In *Edwards*, "no facts indicat[ed] that Sergeant Edwards [the plaintiff] did or would offer any comment on the Department's policies or operations, make any reference to any other member of the Department, or claim[ed] to be speaking for or in any way on behalf of the department." *Id.* at 248. The Supreme Court in *Edwards* ultimately held that Sergeant Edwards was speaking on a matter of public concern and thus entitled to First Amendment protection. *Id.* at 248, 249. All three of those factors, however, are present in Richards' speech in the instant case. First, Richards *did* comment on the Department's operations. Second, as Richards admits, he *did* reference another member of the Department when he commented, "Perfect example, and you know who I'm talking about . . . . How can ANYONE look up or give respect to SGT in Patron [sic] with ONLY 1 ½yrs experience in the street?" And, finally, although he did not explicitly claim to be speaking for or on behalf of the Department, his Facebook page indicated that he was an employee for the Department and he

also had photos of himself in uniform. Thus, it could appear that he was representing the Department when he made the comments on Facebook.

The context and form of the speech further confirm that Richards' speech constituted a personal, not public matter. Choosing Facebook as the forum for his communication may generally indicate that Richards wanted to contribute to a discussion as Facebook provides a platform for many purposes. However, the context in which Richards' speech was made supports the conclusion that his speech did not touch on a matter of public concern. Phrases such as "It's disgusting and makes me sick to my stomach DAILY" and "the next 4yrs can't get here fast enough . . . From what I've been seeing I don't think I can last though" indicate Richards' personal complaints and not matters of public concern.

Therefore, for the aforementioned reasons, the Court finds that Richards' speech is not protected under the First Amendment. If an employee's speech "cannot be fairly characterized as constituting speech on a matter of public concern, it is unnecessary for us to scrutinize the reasons for [the employee's] discharge." *Connick*, 461 U.S. at 146. If the employee cannot carry this burden, then summary judgment for the employer is appropriate, even if the termination decision "may not be fair" or is "mistaken or unreasonable." *Id.* at 146–47.

### ii. Policy Language

Because Liverman's language relates to matters of public concern, the Court must under the *Pickering* balancing test, weigh the Department's interest in promulgating the above-mentioned restrictions against both Liverman's and the public's right to publicly discuss matters of officer safety and questions of liability. Prior to balancing the parties' respective interests, however, the Court must determine the scope of the 2013 Social Networking Policy's provisions.

The 2013 Social Networking Policy, "prohibit[s] activities by employees on such web sites such as MySpace, Facebook, Twitter, and other social sites" if it "may bring discredit to the Petersburg Bureau of Police and any other City of Petersburg Department." Br. in Supp. of

Defs.' Mot. at Ex. 2. C.   The Department's 2013 Social Networking Policy provides many examples of social networking sites[19] but also leaves the definition open to "other social sites."

In particular, Liverman challenges the validity of the following provisions of the 2013 Social Networking Policy under the First Amendment:  Section II; [20]  the introductory paragraph of Section IV;[21] and Section IV ¶¶ 4, 5, 6[22].[23]   The 2013 Social Networking Policy enumerates specific examples of what qualifies as a personal grievance and what constitutes a matter of public concern.   Included in some of the named provisions are warnings of disciplinary action

---

[19] The policy defines "Social Networking" as follows:

> Social Networking—using such Internet or mobile formats as Facebook, Twitter, MySpace, LinkedIn, Foursquare, Gowalla Police Pulse, the Squad Room, Usenet groups, online forums, message boards or bulletin boards, blogs, and other similarly developed formats, to communicate with others using the same groups while also networking with other users based upon similar interests, geographical location, skills, occupation, ideology, beliefs, etc.

Defs.' Mem. Ex. 2. C.

[20] Section II of the 2013 Social Networking Policy provides,

> It shall be the policy of the Bureau of Police to prohibit activities by employees on such web sites such as My Space, Facebook, Twitter and other social sites that may bring discredit to the Petersburg Bureau of Police and any other City of Petersburg Department.  Professionalism, ethics, and integrity are of paramount importance in the law enforcement community.  To achieve and maintain the public's highest level of respect, we must place reasonable restriction on our conduct and hold to these standards of conduct whether on or off-duty.

Defs.' Mem. Ex. 2. C.

[21] The prelude to Section IV instructs,

> Employees shall not post, transmit, reproduce, and/or disseminate information (text, pictures, video, audio, etc.) to the internet or any other forum (public or private) that would tend to discredit or reflect unfavorably upon the Petersburg Bureau of Police or any other City of Petersburg Department or its employees.

*Id.*

[22] Section IV ¶ 6 provides a "catch-all" limiting provision in the final paragraph,

> The Petersburg Bureau of Police strongly discourages employees from posting, information regarding off-duty activities.  Additional, social networking violations deemed to be in violation of the Policy 100-1, Rules of Conduct, will be forwarded to Chief of Police or designee for appropriate disciplinary action.

*Id.*

[23] Because Liverman was fired under Section IV ¶ 4, the Court will focus its analysis primarily on the language of that provision.

for failure to comply.  The policy does indeed reference the rights of employees to speak but also places restrictions on expression.  Specifically, Part IV, Section 4 of the policy provides the following,

> Negative comments on the internal operations of the Bureau, or specific conduct of supervisors or peers that impacts the public[']s perception of the department is not protected by the First Amendment free speech clause, in accordance with established case law.

Br. in Supp. of Defs.' Mot. at Ex. 2. C.  Officer expression is also limited by the following prohibition:

> Officers may comment on issues of general or public concern (as opposed to personal grievances) so long as the comments do not disrupt the workplace, interfere with important working relationships or efficient work flow, or undermine public confidence in the officer. The instances must be judged on a case-by-case basis.

*Id.* The Department characterizes the restrictions on employee speech set forth in the 2013 Social Networking Policy as applying "both on and off-duty."  The Department claims the policy distinguishes between speech made as a citizen as opposed to that made in an official capacity.

The Department argues that the policy literally acknowledged employees' First Amendment rights and tracks such rights.  For example, the Department looks to the language contained in Part IV, Section 4, providing, "the instances must be judged on a case-by-case basis."  This language, Defendants argue, parallels the *Pickering* balancing test.  Liverman argues in response that the policy does not precisely distinguish between employee speech as part of the employee's official duties, which may lawfully be restricted, and employee speech on workplace topics of public concern not offered within the scope of the employee's official duties, which may not be categorically proscribed.  Further, Liverman argues that Part IV, Section 4 purports to establish active censorship of any statements concerning the internal operation of the Department regardless of whether the communication is on-duty or off-duty, on a matter of public concern or not, and without weighing the interest of the parties on a case-by-case basis.

Liverman contends that the terms used in the policy, like "so long as" create a bright-line rule, which contradicts the instruction provided in *Pickering*.

These provisions clearly aim at speech that is of considerable importance to the public. Indeed, discussion regarding current Department policies and activities is "perhaps the paradigmatic 'matter[] of public concern.'" *Sanjour v. Envtl. Prot. Agency*, 56 F.3d 85, 91 (D.C. Cir. 1995). Here, Liverman was disciplined—*i.e.*, given an oral reprimand and returned to probationary status for six months—for stating on Facebook that "[t]here used to be a time when you had to earn a promotion or a spot in a specialty unit . . . but now it seems as though anything goes and beyond officer safety and questions of liability, these positions have been 'devalued' . . . and when something has no value, well it is worthless."  This speech concerning the priorities and effectiveness of the Department is obviously of interest to the public.

The Court will now further consider whether the Department's posited interests are significant enough to outweigh the free speech interests of Liverman and the public.

### iii.   *Pickering* Balancing

Next, upon finding that Liverman's speech relates to matters of public concern, and that the plain language of the 2013 Social Networking Policy restricts his speech, the Department "must show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's 'necessary impact on the actual operation' of the Government."  *NTEU*, 513 U.S. at 468 (quoting *Pickering*, 391 U.S. at 571); *Rankin*, 483 U.S at 388 (stating that the government bears the "burden of justifying the discharge on legitimate grounds").  That is, to determine whether the Department's conduct in reprimanding Liverman was justified, this Court must weigh the "interests of [Liverman], as a citizen, in commenting upon matters of public concern and the interests of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."  *Pickering*, 391 U.S. at 568.

The Supreme Court has held that the government's burden of justifying the restriction on free speech "is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on . . . speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Edenfield v. Fane*, 507 U.S. 761, 770-71 (1993). In other words, the government must demonstrate actual harm before its interests may be deemed to justify a restriction on speech. *Id.* However, the court need not require the government "employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action." *Connick*, 461 U.S. at 152; *see Waters v. Churchill*, 511 U.S. 661, 673 (1994) (plurality opinion); *Maciariello v. Sumner*, 973 F.2d 295, 300 (4th Cir. 1992); *Jurgensen v. Fairfax Cnty., Va.*, 745 F.2d 868, 879-80 (4th Cir. 1984); *Cromer v. Brown*, 88 F.3d 1315, 1327 (4th Cir. 1996) (recognizing that, to be effective, a police department must have the respect of the community and its officers and that "the public has a keen interest in seeing that police officers are free to speak up against any broad-based discrimination in their agencies"). As the Court noted in *Garcetti*, "Government employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services. Public employees, moreover, often occupy trusted positions in society." 547 U.S. at 418–19 (citation omitted). "When close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate." *Connick*, 461 U.S. at 151–52. Indeed, police departments have a particularly strong interest in maintaining discipline and order within their ranks. *See, e.g.*, *Maciariello*, 973 F.2d at 300; *Jurgensen*, 745 F.2d at 880. As the Fourth Circuit stated in *Maciariello*,

> A police department has an undeniable interest in discouraging unofficial internal investigations. If personal investigations were the usual way for an officer to check out suspicious activities of a fellow officer, the effect on efficiency and morale could be very disrupting, and the effectiveness of the police force might deteriorate. Instead of concentrating on their traditional duties in the community, officers with personal hostilities could become preoccupied with personal investigations of one another. Esprit de corps could collapse into a

kafkaesque nightmare of improper investigations into the impropriety of improper investigations.

973 F.2d at 300; *see, e.g.*, *Breuer v. Hart*, 909 F.2d 1035, 1040–42 (7th Cir. 1990).  Therefore, a public employer may restrain job-related speech in order "to maintain discipline and ensure harmony as necessary to the operation and mission of its agencies."  *McVey*, 157 F.3d at 277. But, employees speaking as citizens about the matters of public concern must face only those speech restrictions "that are necessary for their employers to operate efficiently and effectively." *Garcetti*, 547 U.S. at 418.

The balancing test also requires the Court to consider the context in which the speech was made, including the employee's role and the extent to which the speech impairs the efficiency of the workplace.  *Gilchrist*, 749 F.3d at 309. Factors relevant to this inquiry include whether a public employee's speech (1) impaired the maintenance of discipline by supervisors; (2) impaired harmony among coworkers; (3) damaged close personal relationships; (4) impeded the performance of the public employee's duties; (5) interfered with the operation of the [agency]; (6) undermined the mission of the [agency]; (7) was communicated to the public or to coworkers in private; (8) conflicted with the responsibilities of the employee within the [agency]; and (9) abused the authority and public accountability that the employee's role entailed. *Id.* (citation omitted). "The efficient functioning of government offices is a paramount public interest.  Police are the most restrictive in this regard as they are paramilitary—discipline is demanded, and freedom must be correspondingly denied."  *Durham v. Jones*, 737 F.3d 291, 301 (4th Cir. 2013) (internal quotation marks and citations omitted).  Issues of "particular importance" to law enforcement "include 'discipline and harmony in the workplace, confidentiality, protection from false accusations that may prove difficult to counter given the employee's supposed access to inside information . . . and protection of close working relationships that require loyalty and confidence.'"  *Pierson v. Gondles*, 693 F. Supp. 408, 413 (E.D. Va. 1988) (quoting *Piver v. Pender Cnty. Bd. of Edu.*, 835 F.2d 1076, 1081 (4th Cir. 1987)).

In balancing the competing interests, "we do not require the public employer to prove that the employee's speech actually disrupted efficiency, but only that an adverse effect was 'reasonably to be apprehended.'" *Maciariello*, 973 F.2d at 300 (quoting *Jurgensen*, 745 F.2d at 879).

### 1.   The Interests of Liverman and the Public

On the facts of this case, Liverman's free-speech interests outweighed his employer's interest because Defendants fail to sufficiently show that Liverman's Comment harmed or created a "reasonable prediction of harm" to the Department's operations.  *Water*s, 511 U.S. at 673.

Speaking as a citizen, Liverman possesses potent free-speech interests in being able to comment on matters of public concern:  "[S]peech concerning public affairs is more than self-expression; it is the essence of self-government."  *Garrison v. Louisiana*, 379 U.S. 64, 74-75 (1964).  These interests go to the core of the freedoms the First Amendment was designed to protect.  *See, e.g.*, *Roth v. United States*, 354 U.S. 476, 484 (1957) (stating that the First Amendment "was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people").  While the government has special authority to proscribe the speech of its employees, "[v]igilance is necessary to ensure that public employers do not use authority over employees to silence discourse, not because it hampers public functions but simply because superiors disagree with the content of employees' speech." *Rankin*, 483 U.S. at 384.  In *Pickering*, which concerned a teacher's published complaints about the school board's allocation of funds, the Court stated:

> On such a question free and open debate is vital to informed decision-making by the electorate. Teachers are, as a class, the members of a community most likely to have informed and definite opinions as to how funds allotted to the operations of the schools should be spent. Accordingly, it is essential that they be able to speak out freely on such questions without fear of retaliatory dismissal.

*Pickering*, 391 U.S. at 571–72.

Here, the public's interest in Liverman's opinions  may have had particular value to the public in light of his status as a Department employee.  *See e.g.*, *Waters*, 511 U.S. at 674

24

("Government employees are often in the best position to know what ails the agencies for which they work; public debate may gain much from their informed opinions."); *see also Sanjour*, 56 F. 3d at 94. Especially as evidenced by Liverman's reference in his Initial Post to reading other Facebook posts about young officers becoming instructors as well as the public's commentary in response to his Comment, there was an ongoing public debate about the effectiveness of the Department's supervisors. Experienced officers such as Liverman can contribute valuable insights to the discussion. Thus, among other reasons, his speech is valuable to the public because he was speaking from his experience as a member of the Department. His Comment concerning officer safety and possible related liability issues, for example, illuminates potential problems in the management of the Department. Thus, his potential audiences have a strong interest in hearing his Comment given the special knowledge Liverman has as a police officer and the important police department operations on which he commented.

### 2. The Department's Interest

The Department's primary, purported interests are its need to promote the efficient and effective operation of the law enforcement agency. The Department's asserted interest in promoting efficiency is essentially a corollary to its interests in maintaining cohesiveness among patrol officers, effective recruiting efforts, officer comradery, and community trust and partnerships. Here, Defendants unpersuasively argue that these interests of the Department were purportedly harmed or would be harmed by Liverman's Comment.

Specifically with regards to Defendants' argument that Liverman's Comment threatened recruiting efforts, their argument fails. For example, in *Locurto v. Giuliani*, 447 F.3d 159 (2d Cir. 2006), the New York Police Department and New York Fire Department officers' participation in "blackface" was broadcast on the local news and extensively covered in the print media. *Id.* at 180. The court in *Locurto*, in concluding that the City's concern for disruption was reasonable, explained, "[t]he capacity for a particular incident to generate public attention is obviously highly relevant to the City's assessment of the incident's disruptive effects." *Id.*

Similarly, in *McMullen v. Carson*, 754 F.2d 936 (11th Cir. 1985), a clerical employee of the Sheriff's Office of Jacksonville filed suit against the Sheriff because he was fired after appearing on the local televised news as a recruiter for the Ku Klux Klan. *Id.* at 936-37. The *McMullen* court concluded that the Sheriff's interests outweighed the former employee's because the public had become aware that a member of the Sheriff's department was involved with the Ku Klux Klan, which would "dangerously [threaten] to cripple the ability of the . . . agency to perform effectively its public duties," unless the employee was fired. *Id.* at 940.

This case is distinguishable from both *Locurto* and *McMullen* because, in both, the employer's "reasonable prediction of harm" was based on actual widespread publicity of the employees' speech. In *Locurto*, the officers' use of blackface was televised on the local news and the *New York Times* published an article about it, specifically identifying the perpetrators as New York City police officers and firefighters. *Locurto*, 447 F.3d at 165. In *McMullen*, the employee's interview was televised on the local news and printed in the newspaper, and both sources followed up to identify the employee as working in the Sheriff's Office of Jacksonville. *McMullen*, 754 F.2d at 937. Here, Chief Dixon underscores that: (1) many people saw the Facebook activity at issue; (2) the speech specifically referenced the Department; and (3) "[a]lmost all of the people liking or commenting on the [Facebook exchange] knew Liverman was a Petersburg Police officer" and that "the majority of those same individuals were either employed or previously employed by the Department." Br. in Supp. of Defs.' Mot. at 20. Addressing these points in order, Defendants fail to show that anyone other than the thirty-four people who either "liked" or commented on the posts was actually exposed to Liverman's Comment or the rest of the Facebook exchange.[24] *See* Br. in Supp. of Defs.' Mot. at Ex. 7 at 30-40; Ex. 5, ¶ 4, Ex. A. It is unclear as to how many people viewed the Comment. Moreover, Defendants fail to show that a significant number of people would know that Liverman is an

---

[24] The privacy settings (*e.g.*, "public," "customized," "only friends," etc.) of Liverman's Initial Post and Comment, prior to him changing it to "Only Me," are not presented to this Court.

employee of the Department since Liverman did not post the name of his employer—*i.e.*, the Department—and had no pictures of him in uniform on Facebook. *Id.* at Ex. 7 (Liverman Dep. 30:9-15). And, although Chief Dixon argues that the Comment harmed or would harm recruiting efforts, he undermines his own argument by pointing out that "the majority of [the individuals who "liked" or commented] were either employed or previously employed by the Department." Logically then, if the majority of people who participated in the Facebook exchange were previously or currently employees of the Department, then the inference can be drawn that recruiting efforts were not impacted as to them. Based on the evidence presented to this Court, the exposure of the Comment cannot be said to mirror, for example, that present in *Locurto* and *McMullen*.

Furthermore, to support his position, Chief Dixon provided an affidavit, listing his concerns over the publication of the Facebook Comment by Liverman. Additionally, he mirrored his statements made under the penalty of perjury in a response to an interrogatory propounded by Plaintiffs. *See* Br. in Supp. of Defs. Mot. at Ex. 1 ¶ 3 (Chief Dixon Affidavit). Chief Dixon did not present other evidence of any actual disruption resulting from Liverman's communication, other than vague references to Liverman's communications as "strain[ing] [the] Operations" of the Department. *Id.* While Defendants are correct that "concrete evidence" of an actual disruption is not required, there must still be a reasonable apprehension of such a disruption. *See Maciariello*, 973 F.2d at 300. In his affidavit—the only source in the record of the Department's interests—Chief Dixon claimed ostensible damage to recruiting efforts, relationships between colleagues, and the function of the office, generally. Additionally, he alleged that there was divisiveness among patrol officers as well as "hostility, irritation, and distraction between patrol officers." Br. in Supp. of Defs. Mot. Ex. 1 ¶ 3. But Chief Dixon did not articulate any way in which the Department would have been different or was actually different due to Liverman's statements.

Although this Court recognizes that Chief Dixon asserted the Department's interest under the penalty of perjury, his statements nevertheless amount to "generalized and unsubstantiated allegations of 'disruptions,' and predictions thereof." *See Goldstein*, 218 F.3d at 354. This is not to say that there was no impact felt in the Department whatsoever or that there was absolutely no "potential for disruption." This Court agrees that the Department has a strong interest in promoting internal harmony, trust, and camaraderie amongst its officers. But it is not enough that there is some disruption; the amount of disruption has to outweigh the importance of the speech and its concern to the public. *See Connick*, 461 U.S. at 152; *McVey*, 157 F.3d at 279 (Murnaghan, J., concurring) ("A strong showing of public interest in the speech requires a concomitantly stronger showing of government-employer interest to overcome it."). Concerns regarding the safety of the public as well as officer safety and training are substantial concerns that "must be met with a similarly substantial disruption in the calibration of the controlling balancing test." *Id.* As the Fourth Circuit has stated in a factually similar case:

> Indeed, any complaint by one firefighter that another firefighter is violating safety regulations is sure to affect "camaraderie" in the general sense. However, to adopt the district court's approach would permit fire companies-and similarly situated state actors-to sanction the complaining firefighter based upon unsupported and generalized predictions of "disruptions" caused by the complaints. In the context of a fire company, such a result would effectively endorse a "red line of silence," whereby fire companies, police officers and other entities carrying out crucial public functions are permitted to quash complaints affecting public safety under the general aegis of "camaraderie" and the avoidance of disruptions.

*Goldstein*, 218 F.3d at 355.

The Department fails to meet its burden. Although police departments have a particularly strong interest in maintaining discipline and order within their ranks, s*ee, e.g.*, *Maciariello*, 973 F.2d at 300; *Jurgensen*, 745 F.2d at 880, the Department's interest simply do not outweigh Liverman's and the public's interest in allowing freewheeling debate on matters of public concern. Thus, the balance between Liverman's rights as a private citizen under the First Amendment and the Department's asserted interests tilts heavily in favor of Liverman.

### B.   *Qualified Immunity*[25]

The Court turns now to the alternative argument made by Chief Dixon—that even if Liverman's Comment was a matter of public concern, he is entitled to qualified immunity because Chief Dixon believed that:   (1) he reasonably applied the *Pickering* balancing test to Liverman's Facebook Comment to conclude that the Department's interests outweighed any purported concerns Liverman had about inexperienced officers in certain roles; and (2) he reasonably misjudged Liverman's speech as concerning a private, not public, matter.   He also argues that he was reasonable in believing that he was approving the adoption of a lawful social media policy, which incorporated the *Pickering* balancing test.

"Qualified immunity shields government officials performing discretionary functions from personal-capacity liability for civil damages under § 1983, insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."   *Ridpath v. Bd. of Governors Marshall University*, 447 F.3d 292, 306 (4th Cir. 2006) (internal quotation marks omitted).   "A right is clearly established if the contours of the right are sufficiently clear so that a reasonable officer would have understood, under the circumstances at hand, that his behavior violated the right."   *Bailey v. Kennedy*, 349 F.3d 731, 741 (4th Cir.2003) (internal quotation marks and alteration omitted).

The broad legal principle governing this case—that public employees may not be returned to probationary status  on a basis that infringes on their First Amendment rights—was clearly established at the time Liverman was returned to probationary status.   However, the focus must be narrower, as the determination of whether a given right was clearly established requires that the right be defined "at a high level of particularity."   *Campbell*, 483 F.3d 258 (quoting *Edwards*, 178 F.3d at 251); *see Gilchrist*, 749 F.3d at 312 (confirming that the "the right

---

[25] Chief Dixon is being sued in both his personal and official capacity as the Chief of Police of the City. Pursuant to *Will v. Michigan Dep't of State Police*, 491 U.S. 58 (1989), "State officials literally are persons. But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office."   *Id.* at 71 (citation omitted).   Therefore, the claims against Chief Dixon in his official capacity are addressed within the municipal liability argument.

at issue" must be "described at the appropriate level of specificity"); *Pritchett v. Alford*, 973 F.2d 307, 312 (4th Cir. 1992) (noting that "the proper focus is not upon the right at its most general or abstract level of its application to the specific conduct being challenged"). When the right is defined at the proper level of particularity, the question becomes whether a reasonable officer would have known that Liverman's Comment touched on a matter of public concern, thus entitling Liverman to the protection of the First Amendment.

The Fourth Circuit as well as sister circuits have done little to clarify when social media commentary about officer and public safety are matters of public concern and when such commentary are matters of private concern.  Under these circumstances, this Court cannot conclude that Chief Dixon unreasonably viewed Liverman's Comment as involving personal grievances only.  *See Saucier v. Katz*, 533 U.S. 194, 205 (2001) ("The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct. It is sometimes difficult for an officer to determine how the relevant legal doctrine  . . . will apply to the factual situation the officer confronts . . . . If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense.").

This Court also cannot find that Chief Dixon unreasonably adopted the 2013 Social Networking Policy, which claimed to track First Amendment principles. "When determining whether a reasonable officer would have been aware of a constitutional right, we do not impose on the official a duty to sort out conflicting decisions or to resolve subtle or open issues." *McVey*, 157 F.3d at 277.  Here, as with most cases, the Court cannot conclude that reasonable officials in Chief Dixon's position would have known that disciplining Liverman for his Comment pursuant to the 2013 Social Networking Policy would be a violation of his First Amendment rights.  After all, we "do not expect sheriffs [or Chiefs of Police] to be judges and to have the training to sort through every intricacy of case law that is hardly a model of clarity. *Bland v. Roberts*, 730 F.3d 368, 393-94 (4th Cir. 2013) (citing *Lawyer v. City of Council Bluffs*,

361 F.3d 1099, 1108 (8th Cir. 2004)) (holding that defendants were entitled to qualified immunity because "[p]olice officers are not expected to parse code language as though they were participating in a law school seminar"). Also, "[p]articularly with regard to legal conclusions, lay officers obviously cannot be expected to perform at the level achievable by those trained in the law." *Kroll v. United States Capitol Police*, 847 F.2d 899, 906 (D.C. Cir. 1988) (Robinson, J., concurring) (footnote omitted). This Court cannot conclude that Chief Dixon's actions transgressed bright lines. "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Maciariello*, 973 F.2d at 298; *see also McVey*, 157 F.3d at 277 (citations omitted) ("Thus, particularly in First Amendment cases, where a sophisticated balancing of interests is required to determine whether a plaintiff's constitutional rights have been violated, only infrequently will it be clearly established that a public employee's speech on a matter of public concern is constitutionally protected.") (internal quotation marks omitted).

In sum, the Fourth Circuit has recognized that given the difficult application of the First Amendment balancing test, courts can rarely say that the law was so clearly established that reasonable officials would have known that an employee's activity was constitutionally protected. *Pike v. Osborne,* 301 F.3d 182, 185 (4th Cir. 2002); *DiMeglio v. Haines,* 45 F.3d 790, 806 (4th Cir. 1995). For these reasons, Chief Dixon is entitled to qualified immunity from monetary damages.

### C. *Municipal Liability*

A plaintiff suing a municipal entity under 42 U.S.C. § 1983 must show that his or her injury was caused by municipal policy or custom. *Monell v. Dept. of Soc. Servs. New York City*, 436 U.S. 658, 694 (1978). A municipality cannot be held liable under § 1983 solely because it employed a tortfeasor. *Id.* at 691. "[M]unicipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances." *Stickley*, 416 F. App'x at 273 (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986)). To hold a municipality liable, the decisionmaker must possess "'final authority to establish municipal policy with

respect to the action ordered.'" *Love–Lane*, 355 F.3d at 782 (quoting *Pembaur*, 475 U.S. at 481). The question of who possesses final policymaking authority is one of state law. *Pembaur,* 475 U.S. at 483.

Here, Plaintiffs fail to show that Chief Dixon possesses the final authority required to establish municipal liability. They merely argue that simply by virtue of his status as the "'chief law enforcement officer of' the City of Petersburg," (Pls.' Reply at 8) (citing Va. Code § 15.2-1701), Chief Dixon "'has the responsibility and authority to implement *final* municipal policy with respect to a particular course of action,'" *id.* (quoting *Riddick v. Sch. Bd. of the City of Portsmouth*, 238 F.3d 518, 523 (4th Cir. 2000)). Plaintiffs' argument is unavailing. Defendants bring to the Court's attention the fact that the *City* retains the final decision-making authority with respect to the Chief of Police's actions. Defs.' Opp'n at 3–4, 10–11. The City's ordinances provide that the Chief of Police "serve[s] at the pleasure of the city manager" and "shall be under the direction and control of the city manager." Here, the City never ratified the 2013 Social Networking Policy. *See Stickley*, 416 F. App'x at 273; *see also Crowley v. Prince George's Cnty.*, 890 F.2d 683, 686–87 (4th Cir. 1989) (holding that even where a police chief has been delegated final decision-making authority for personnel decisions, that does not make the police chief the final policymaker for purposes of imputing municipal liability). Therefore, no municipal liability attaches to the City.

> D.  *Retaliation Claims*

In Counts III and IV of the Complaint, Liverman and Richards allege that Chief Dixon violated their First Amendment Freedom of Speech Rights by retaliating against them for their Facebook posts. Generally, in order to prove a retaliation claim for exercising the right to free speech, Liverman and Richards must prove: (1) they spoke as citizens, not employees, on a matter of public concern; (2) their interest as citizens in the speech at issue "outweighed the employer's 'interest in providing effective and efficient services to the public;'" and (3) there was a sufficient causal connection between the speech and the retaliatory conduct. *Ridpath*, 447 F.3d

at 316 (*quoting McVey*, 157 F.3d at 277-78); *Constantine v. Rectors and Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005).

To constitute actionable retaliation, the employer's conduct must adversely impact First Amendment rights. *See Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir.2000). De minimis actions do not constitute adverse action for purposes of a First Amendment retaliation claim. *Id.* at 686. Thus, a public employer adversely affects an employee's First Amendment rights when it refuses to rehire an employee because of the exercise of those rights, *see Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 285–87 (1977); or when it makes decisions, which relate to "promotion, transfer, recall, and hiring," based on the exercise of an employee's First Amendment rights, *Rutan v. Republican Party*, 497 U.S. 62, 79 (1990). On the other hand, courts have declined to find that an employer's actions have adversely affected an employee's exercise of his First Amendment rights where the employer's alleged retaliatory acts were criticism, false accusations, or verbal reprimands. *See Benningfield v. City of Houston*, 157 F.3d 369, 376–77 (5th Cir.1998) (holding that employees "falsely accused" of criminal wrongdoing and "verbally reprimanded" by their employer failed to allege adverse employment actions sufficient to constitute retaliation), *cert. denied*, 526 U.S. 1065 (1999); *Harrington v. Harris*, 118 F.3d 359, 366 (5th Cir.1997) (holding that an employer's criticism of employees and failure to award them merit pay increases did not constitute actionable adverse employment actions).

As previously detailed, Richards cannot satisfy the first prong of the retaliation test because he was addressing a private, not public, concern. Therefore, his retaliation claims must fail.

As to Liverman, he satisfies the first and second prong of a retaliation claim since he was speaking on a matter of public concern and his interests outweighed those of the Department's. As to the third prong, Liverman alleges that being returned to probationary status constitutes adverse employment action. That is the only adverse action that is apparent to this Court. The

evidence supports the conclusion that a sufficient causal connection exists between Liverman's Facebook posts speech and the retaliatory conduct. *Ridpath*, 447 F.3d at 316.

First Amendment retaliation claims are subject to the affirmative defense of qualified immunity. *Trulock v. Freeh*, 275 F.3d 391, 405-06 (4th Cir. 2001). Chief Dixon would not be entitled to such immunity if (1) the violation of the deputies' constitutionally protected rights was clearly established at the time of the challenged acts and (2) a reasonable official would have understood that his conduct violated that clearly established law. *See Henderson v. Simms*, 223 F.3d 267, 271 (4th Cir.2000). For the reasons stated more fully above, Chief Dixon is entitled to qualified immunity, and therefore is not liable for the retaliation claims.

As to the City's liability, a municipality may be liable under § 1983 only when "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 694 (1978). Liverman must show the City had knowledge of unconstitutional retaliatory conduct and took no action in response, thereby evincing a custom or policy of deliberate indifference. *Williams v. Griffin*, 952 F.2d 820, 826 (4th Cir. 1991). All of this assumes, of course, that unconstitutional conduct occurred in the first place. Even if unconstitutional conduct did occur, there is no evidence that the City knew why Liverman was disciplined or was involved in the investigation related to the Facebook postings. While Major Hinton prepared the personnel action forms indicating Liverman's placement on probation for signature by City officials, namely Claristine Moore and the City Manager, the City was not involved in the investigation or determination of discipline. Nor is there any evidence that the City was involved in drafting or approving policies and procedures put in place by the Department.

In Counts V and VI of the Complaint, Liverman and Richards claim they were retaliated against by Chief Dixon and the City once they made it known that they planned to file suit against Defendants. The particular actions that Plaintiffs allege were retaliatory include:

Defendants opening up investigations against them and also recommending them for termination.

Liverman was investigated and disciplined twice after the Facebook discipline and after he made known his intentions to sue Chief Dixon and the City. The first investigation occurred because of the Freedom of Information Act ("FOIA") request included in the notice letter his counsel sent to the City. In gathering the documents responsive to that request, the Department discovered Liverman had engaged in some inappropriate email correspondence with a fellow officer. Major Hinton asked for further investigation. Upon further investigation and, pursuant to Liverman's own admissions, it became clear that Liverman was having sex on the job and using Department property to engage in sexual conduct. He admitted to engaging in this behavior. Defendants also presented many pieces of evidence supporting that Liverman was also investigated for failing to maintain his duty post until Chief Dixon arrived. When Chief Dixon arrived and Liverman was not there, the investigation was launched by Sargent Chambliss, Liverman's immediate supervisor. Liverman's discipline was a result of his own behavior, a behavior that the evidence shows has been well-documented in the past. He had been disciplined many times in the past, including for insubordination. Therefore, Liverman's claim in Count V of Plaintiffs' Complaint is without merit.

As to Richards, he was investigated twice after he was disciplined for his Facebook comments and after he made the City aware that he planned to file suit. Both investigations were launched as a result of complaints made by fellow officers. The evidence establishes that the first complaint initially arose from Richards' participation in the Shop with the Cop program. Officer Clement made the complaint after receiving complaints from two Wal-Mart employees. The investigation concluded with a finding of no wrongdoing as it regarded the Shop with a Cop program. In fact, Richards was praised for his work with that program. The investigation did find he wrongfully requested turkeys from Wal-Mart without approval from Chief Dixon. Officer Clement was assigned to that task. Richards received an oral reprimand.

The second investigation of Richards related to a report made to the media about a fellow officer's spouse and was initiated by that fellow officer.   The investigation concluded with a finding that Richards did not engage in any wrongdoing.   It is difficult to imagine how the Department could have determined to retaliation against Richards for filing suit against the City and Chief Dixon where the investigations were launched as a result of complaints made by fellow officers.   These officers were not Richards' supervisors or part of the Command Staff. There is no evidence that these investigations were encouraged by any one above Richards. Therefore, no retaliation occurred in light of Plaintiffs filing the notice of claims.

V.   **CONCLUSION**

For the aforementioned reasons, the Court will GRANT IN PART and DENY IN PART Plaintiffs' Motion.[26] Specifically, the Court GRANTS Plaintiffs' Motion as to Count I of Plaintiffs' Complaint and DENIES Plaintiffs' Motion as to Count II.   The Court finds that the 2013 Social Networking Policy clearly restricts Liverman's First Amendment rights.   Further, the Court finds that the Department's interest in providing effective and efficient services to the public does not outweigh Liverman's interest in expressing his opinion regarding officer training, officer safety, experience as a requirement for promotion to the supervisory level, and issues of potential liability.   *See Pickering*, 391 U.S. at 572-73.   In contrast, Richards' speech was private in nature and did not address a matter of public concern.   Accordingly, Defendants' Motion as to Count I is DENIED but is GRANTED as to Count II.

Defendants' Motion as to Counts III and IV is hereby GRANTED.   Chief Dixon is entitled to Qualified Immunity.   Similarly, as to any claim against the City, no municipal liability attached because the City did not ratify the 2013 Social Networking Policy.   Further, the City and

---

[26] Plaintiffs argue that they are only seeking equitable relief.  Pls.' Reply at 23.  Plaintiffs apparently seek an injunction—but nowhere in their moving papers do they argue the elements required for such injunction and thus no injunction will be granted.  Also, to the extent that Plaintiffs seek monetary damages in Counts I and II, their claims are barred because Chief Dixon is entitled to qualified immunity.  Liverman is, therefore, only entitled to a declaratory judgment that his First Amendment rights were violated.

Chief Dixon did not violate Plaintiffs' First Amendment Rights to petition the government for redress by retaliating against them for noticing their claims.  As such, Defendants' Motion as to Counts V and VI is hereby GRANTED.

Let the Clerk send a copy of this Memorandum Opinion to all counsel of record.

An appropriate Order will issue.

_____/s/_____
James R. Spencer
Senior U. S. District Judge

ENTERED this ___6th____ day of May 2015.